## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DAN J. RAMOS, LAURA POSADAS,** | ) | |
| **and TINA WILLIAMS** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No.  SA-14-CA-502-XR** |
| **VS.** | ) | |
| | ) | |
| **UBER TECHNOLOGIES, INC. and** | ) | |
| **LYFT INC.,** | ) | |
| | ) | |
| **Defendants.** | | |

### ORDER

On this date, the Court considered the Motion to Dismiss Plaintiff's Complaint (docket no. 6) filed by Uber Technologies, Inc., the Corrected Motion to Dismiss Complaint (docket no. 10) filed by Lyft Inc., and Plaintiffs' Motion for Leave to File Amended Complaint (docket no. 13). The issues presented are whether Plaintiffs have standing to file their claims under Title III of the Americans with Disabilities Act and whether their Complaint states a claim for relief. After careful consideration, the Court will deny the motions to dismiss and grant Plaintiffs' motion to amend.

### I. Background

According to the Original Complaint, Plaintiffs Posadas, Ramos, and Williams are mobility-impaired individuals who use wheelchairs and require wheelchair accessible vehicles for their transportation needs or other accommodating services such as assistance with storing their wheelchairs. Docket no. 1 at ¶¶ 2, 7-9, 16. Plaintiffs allege that Uber and Lyft "have entered the vehicle-for-hire market in both Houston and San Antonio. Uber and Lyft customers use a smartphone app to locate, schedule, and pay for their travel. Consumers enter into contracts and business relationships whereby Uber and Lyft transport the consumer(s) to their desired location and the consumer(s) agree to pay for the services with a credit car via their smartphone." *Id.* ¶ 15.

Plaintiffs filed this lawsuit alleging that Defendants Uber and Lyft "do not provide vehicles-for-hire services to mobility impaired consumers such as Plaintiffs who require wheelchair

accessible transportation vehicles or other accommodating services." *Id.* ¶ 2.  Plaintiffs further allege that Uber and Lyft "allow their vehicles-for-hire to deny service to the disabled" and "provide no training or guidance to the vehicles-for-hire that use their service concerning lawfully meeting the needs of disabled customers." *Id.*  Plaintiffs assert that they bring suit "because Defendants Uber and Lyft have failed to offer services required by the ADA to mobility impaired individuals such as Plaintiffs Posadas, Ramos and Williams." *Id.* ¶ 3.  Plaintiffs allege "[u]pon information and belief" that Uber and Lyft do "not provide any manner for securing a wheelchair accessible vehicle or providing services at all for customers such as Plaintiffs Posadas, Ramos, and Williams." *Id.* at ¶¶ 17-18.  The Complaint asserts a cause of action for "Discriminat[ion] Against Mobility Impaired Citizens" in violation of 42 U.S.C. § 12184(a), which provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce."

Defendants Lyft and Uber both filed motions to dismiss.  Both Defendants moved to dismiss for lack of jurisdiction under Rule 12(b)(1), arguing that Plaintiffs lacked standing.  Defendants noted that Plaintiffs had never used Uber's or Lyft's apps to connect with a person looking to provide a ride and that they have never been denied service "or suffered any other form of discrimination" on the basis of disability.  Docket no. 6 at 3; Docket no. 10 at 2.  Defendants also both moved to dismiss for failure to state a claim under Rule 12(b)(6).

Plaintiffs responded to the motions to dismiss and also moved for leave to file an amended complaint to "account for the significant factual developments that have occurred since the original complaint was filed, including a denial of transportation service by Uber Technologies, Inc., and Lyft, Inc., injuring the Plaintiffs."  Docket no. 13 at 1.  The proposed Amended Complaint alleges that: Plaintiff Ramos attempted to obtain transportation from Uber in July 2014 and from Lyft in August 2014 but they did not dispatch an accessible vehicle and were unable to accommodate him; Plaintiff Williams attempted to obtain transportation from Uber in August 2014 but Uber did not dispatch an accessible vehicle and was unable to accommodate her; Plaintiff Posadas attempted to obtain transportation from Lyft and Uber in August 2014 but neither company dispatched an accessible vehicle and both were unable to accommodate her.  In addition, the proposed Amended Complaint adds a claim under Chapter 121 of the Texas Human Resources Code.

On January 14, 2015, this Court concluded that Plaintiffs need not have sought and been denied service by Uber or Lyft to have standing to assert a claim, so long as they established that they had actual notice that Defendants did not intend to comply with the ADA pursuant to 42 U.S.C. § 12188. However, although Plaintiffs asserted that they had such actual notice, they failed to provide any facts, affidavits, or evidence demonstrating this assertion, and their allegations "on information and belief" were alone insufficient to establish actual notice. Accordingly, the Court ordered Plaintiffs to either file affidavits demonstrating that they had such actual notice at the time they filed their lawsuit and that, but for that notice, they would have used Uber and Lyft, or to voluntarily dismiss their lawsuit without prejudice. Plaintiffs responded by filing affidavits on February 2, 2015. All motions are now ripe for review.

## II. Standard of Review

The Court must dismiss a case for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *See Home Builders Ass'n of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). In deciding a motion to dismiss pursuant to Rule 12(b)(1), the Court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of disputed facts. *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). Particularized means "that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. *Id.* At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561; *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 218 (5th Cir. 2001).

In considering a motion to dismiss under 12(b)(6), all factual allegations from the complaint should be taken as true. *Fernandez-Montez v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Courts may look only to the pleadings in determining whether a plaintiff has adequately stated a claim; consideration of information outside the pleadings converts the motion to one for summary judgment. FED. R. CIV. P. 12(d). To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Factual allegations must be sufficient to "raise a right to relief above the speculative level." *Id.* A well-pleaded complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable." *Id.* at 556.

## III. Analysis

### A. Applicable ADA Provisions

#### 1. In General

Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and by private entities providing certain services, including specified public transportation services. *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005) ("Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."); 42 U.S.C. § 12182 ("Prohibition of discrimination by public accommodations"); 42 U.S.C. § 12184 ("Prohibition of discrimination in specified public transportation services provided by private entities").

"The term 'specified public transportation' means transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10). Public transportation services include "demand responsive systems," which means "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route

system." 42 U.S.C. § 12181(3).[1]  Plaintiffs allege that Uber and Lyft "both engage in a demand responsive system as defined by 42 U.S.C. § 12181." Orig. Compl. at ¶ 14.

In the Original Complaint, Plaintiffs' first cause of action cites § 12184 ("Prohibition of discrimination in specified public transportation services provided by private entities") and the regulations at 49 C.F.R. § 37.29 ("Private entities providing taxi service"), and alleges that Uber and Lyft and their service providers "have failed to provide any mechanism by which to serve mobility impaired individuals such as Plaintiffs."  Thus, Plaintiffs are alleging that Uber and Lyft are subject to § 12184 as private entities that are primarily engaged in the business of transporting people and whose operations affect commerce, that they engage in a demand responsive system, that they are subject to the regulations governing private entities providing taxi service, and that they are discriminating against Plaintiffs in the full and equal enjoyment of their public transportation services by failing to provide service to them.

As noted, section 12184(a) provides a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a).  Section 12184 further explains that, for purposes of § 12184(a), discrimination includes:

> (1) the imposition or application by a[n] entity described in subsection (a) of this section of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully enjoying the specified public transportation services provided by the entity, unless such criteria can be shown to be necessary for the provision of the services being offered;

> (2) the failure of such entity to--
> (A) make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title;
> (B) provide auxiliary aids and services consistent with the requirements of section 12182(b)(2)(A)(iii) of this title; and
> (C) remove barriers consistent with the requirements of section 12182(b)(2)(A) of this title and with the requirements of section 12183(a)(2) of this title;

---

[1] A "fixed route system" "means a system of providing transportation of individuals (other than by aircraft) on which a vehicle is operated along a prescribed route according to a fixed schedule." 42 U.S.C. § 12181(4).

(3) the purchase or lease by such entity of a new vehicle (other than an automobile, a van with a seating capacity of less than 8 passengers, including the driver, or an over-the-road bus) which is to be used to provide specified public transportation and for which a solicitation is made after the 30th day following the effective date of this section, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs; except that the new vehicle need not be readily accessible to and usable by such individuals if the new vehicle is to be used solely in a demand responsive system and if the entity can demonstrate that such system, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service provided to the general public;

(4)(A) the purchase or lease by such entity of an over-the-road bus which does not comply with the regulations issued under section 12186(a)(2) of this title; and (B) any other failure of such entity to comply with such regulations; and

(5) the purchase or lease by such entity of a new van with a seating capacity of less than 8 passengers, including the driver, which is to be used to provide specified public transportation ... that is not readily accessible to or usable by individuals with disabilities, including individuals who use wheelchairs; except that the new van need not be readily accessible to and usable by such individuals if the entity can demonstrate that the system for which the van is being purchased or leased, when viewed in its entirety, provides a level of service to such individuals equivalent to the level of service provided to the general public;
. . .

42 U.S.C. § 12184(b).

Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 12188, which provides:

The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title. Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.

42 U.S.C. § 12188(a)(1).

2. Whether Plaintiffs must allege or prove that Defendants are public accommodations?

Uber contends that "Title III applies only to entities that own, lease, or operate a place of public accommodation," citing § 12182(a).  Thus, Uber argues, Plaintiffs must establish that Uber is a public accommodation to state a claim under Title III, and Uber argues that it is not a place of

public accommodation as a matter of law. Similarly but more narrowly, Lyft contends that section 12184(b)(2)'s incorporation of the requirements for public accommodations in section 12182(b)(2) means that section 12184(b)(2) requires Plaintiffs to establish that Lyft operates a place of public accommodation. However, Uber and Lyft misread Title III – none of section 12184's provisions require a plaintiff to establish that the defendant operates a place of public accommodation.

As noted in its title, "Public Accommodations and Services Operated by Private Entities," Title III expressly applies to public accommodations *and* certain services operated by private entities. Section 12182(a) prohibits discrimination "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." In contrast, section 12184, the section relied upon by Plaintiffs, is not limited to public accommodations, but prohibits discrimination in specified public transportation services provided by private entities that primarily engage in the business of transporting people and whose operations affect commerce. Similarly, section 12189 also requires "any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes" to make them accessible and is not limited to public accommodations. Uber's restrictive reading of Title III as governing only public accommodations is contrary to its structure and its plain language.

Similarly, Lyft's assertion that section 12184(b)(2) incorporates the requirement from section 12182 that the defendant be a public accommodation misconstrues the statute. Title III divides those private entities that operate a demand responsive system into two covered groups: (1) private entities (whether public accommodations or not) that provide specified public transportation services and are "primarily engaged in the business of transporting people and whose operations affect commerce," which are subject to § 12184 (these include taxi services),[2] and (2) public

---

[2] These entities are not required to also be public accommodations, but they may be, just as the cruise ship in *Spector* was both a public accommodation ("a floating resort") and a provider of specified public transportation services. *Spector*, 545 U.S. at 129 ("there can be no serious doubt that the NCL cruise ships in question fall within both definitions under conventional principles of interpretation"). The cruise ship was therefore subject to both § 12182 and § 12184's general provisions.

accommodations that operate a demand responsive system but that are not primarily engaged in the business of transporting people (*i.e.*, not subject to § 12184), which are subject to § 12182(b)(2)(C) (these include hotels with hotel shuttles).[3]

Some of the prohibitions on discrimination are the same for both types of operators of demand responsive systems. Section 12184 provides that private entities primarily engaged in the business of transporting people and whose operations affect commerce discriminate by failing to make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii), and by failing to provide auxiliary aids and services consistent with the requirements of section 12182(b)(2)(A)(iii). While section 12182(b)(2)(A)(ii) and (iii) apply to public accommodations because they are in section 12182, these provisions contain no public accommodation requirement. And section 12184(b)(2) plainly applies to "such entity" described in section 12184, not the entity described in section 12182 (public accommodation). Therefore, section 12184(b)(2) does not incorporate the requirement that the defendant operate a place of public accommodation; it simply incorporates the requirements to make reasonable modifications and to provide auxiliary aids and services in the same manner that public accommodations must do so. In addition to being

---

[3] Section 12182(b)(2)(C), states that, for purposes of subsection (a) of section 12182 (prohibiting discrimination by any person who owns, leases (or leases to), or operates a place of public accommodation) , discrimination includes--

> (i) a failure of <u>a private entity which operates a demand responsive system and which is not subject to section 12184 </u>of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

> (ii) the purchase or lease by <u>such entity</u> for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

42 U.S.C. § 12182(b)(2)(C) (emphasis added).

inconsistent with the statute's plain language and structure, Lyft's construction adding a public accommodation requirement to section 12184(b)(2) would render section 12184(b)(2) redundant and useless, given that a public accommodation would already be subject to section 12182(b)(2).

Accordingly, the Court rejects Defendants' arguments that Plaintiffs must allege and prove that Uber and Lyft operate places of public accommodation in order to state a claim. The motions to dismiss on this basis are denied.

## B. Whether Plaintiffs have standing to assert their claims?

This Court has previously considered standing to assert Title III claims in its Orders in *Betancourt v. Federated Department Stores*, 732 F. Supp. 2d 693 (W.D. Tex. 2010) and *Betancourt v. Ingram Park Mall, L.P.*, 735 F. Supp. 2d 587 (W.D. Tex. 2010). As this Court noted, under the terms of the ADA, injunctive relief is available "to any person who is being subjected to discrimination on the basis of disability in violation of [Title III]." 42 U.S.C. § 12188(a)(1). Although "any person who is being subjected to discrimination based on disability in violation of" Title III has a cause of action, whether a plaintiff has a cause of action is a distinct issue from whether she has standing under Article III. *Federated*, 732 F. Supp. 2d at 701-02 (citing *Davis v. Passman*, 442 U.S. 228, 239 n. 18 (1979) (noting the difference between having a cause of action and standing)). Thus, because a federal plaintiff must demonstrate standing for each type of relief sought, and the relief available to a Title III ADA plaintiff is injunctive relief, a plaintiff must satisfy the Article III standing requirements for injunctive relief. Further, "whether a person has Article III standing to sue under [a particular statute] depends in great measure on the particular rights conferred by th[at] statute[ ]." *Id.* at 707. It follows that whether a plaintiff has suffered an injury in fact sufficient to confer standing under Title III is determined largely by the rights conferred by the ADA. *Id.*

Uber makes various arguments in support of its 12(b)(1) motion. The Court previously denied the motion to the extent Uber's arguments were merits arguments that turned on whether Uber is subject to or is violating Title III. *See* docket no. 35. The Court further rejected Lyft's argument that Plaintiffs lacked standing at the time of filing suit solely because Plaintiffs did not allege that they had tried to use the app to obtain a ride and had not actually been denied service. *See id.*; *see also Frame v. City of Arlington*, 657 F.3d 215, 235-36 (5th Cir. 2011) (addressing city's contention that the plaintiffs lacked standing with respect to inaccessible sidewalks that they had not

-9-

personally encountered and noting that "imminence" is an "elastic concept" that is broad enough to accommodate challenges to at least some sidewalks that a disabled person had not personally encountered).

The ADA expressly recognizes that a plaintiff need not have visited an establishment or requested services if the plaintiff knows doing so will result in discrimination. Specifically, Title III does not "require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." 42 U.S.C. § 12188; *Frame*, 657 F.3d at 236. Just like a plaintiff who uses a wheelchair need not engage in the "futile gesture" of attempting to enter an inaccessible building, an ADA plaintiff need not request services as long as they have actual notice that they would be denied services or treated in a discriminatory manner and they are being deterred from attempting to obtain the services by such knowledge.[4] In either case, the knowledge of noncompliance and the deterrence/loss of opportunity are sufficient to create an existing and ongoing ADA injury, despite the fact that the plaintiff was never personally denied services. *See* docket no. 35 (noting that the Supreme Court in *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) found deterrence from swimming in a polluted river to be sufficient injury without requiring the plaintiffs to swim in the river). *Cf. Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 365 (1977) ("The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would

---

[4] *See Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) ("Although plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, see 42 U.S.C. § 12188(a)(1), they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers."); *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136-37 (9th Cir. 2002) ("under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues").

not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.").

However, to invoke the "futile gestures" exception, an ADA plaintiff must demonstrate actual knowledge of noncompliance, and to obtain injunctive relief, must demonstrate that she is being deterred by such knowledge.  The Court agreed with Lyft's assertion that "Plaintiffs fail[ed] to plead any facts to suggest they have any personal knowledge regarding Lyft's ADA compliance whatsoever" and with Uber's contention that Plaintiffs' allegations could be speculative rather than based on actual notice.  Because Plaintiffs' allegations "on information and belief" were insufficient to demonstrate Plaintiffs' actual notice, the Court directed Plaintiffs to file affidavits or, alternatively, to dismiss the case without prejudice.  The Court further directed Plaintiffs to demonstrate that they would use Uber and Lyft but are currently being deterred from doing so by the alleged ADA violations.  Plaintiffs responded by filing affidavits.

In his affidavit, Plaintiff Ramos states that he is mobility-impaired and legally blind, and requires the use of a wheelchair to maneuver.  He states that he uses VIA Metropolitan transit and traditional taxi cab services every week in San Antonio.  Ramos attests that, before he decided to seek legal action against Uber or Lyft, he knew that these companies had made the decision to deny service to mobility impaired Texans because their refusal to provide service to the disabled had been reported in the news and had been a topic of conversation among mobility-impaired customers who relied on private transportation to go to the doctor or attend to other personal tasks.  Ramos attaches an article dated May 22, 2014 that states, "The ride-sharing companies also discriminate against the disabled by not allowing users to request a wheelchair accessible vehicle through their apps . . . ."  Ramos states that he also examined the apps used for securing rides, and neither provide a method to identify a mobility-impaired customer or to request an accommodating vehicle.

Ramos states that it would only serve to embarrass him to attempt to use their services, and he "did not attempt to use Uber or Lyft before filing this lawsuit because [he] knew they would have denied [him] service."  Ramos states that such past denials of services by others have been a source of humiliation and he chose not to order Uber or Lyft service before filing the lawsuit.

Ramos states that, after filing suit, he and his attorneys decided to test the idea that Uber and Lyft would deny him service even though he knew it would be futile.  According to the affidavit, Ramos requested Uber service and a driver with a truck responded, but "Uber failed to meet [his] needs."  Ramos states he requested Lyft service and a "man in a sedan" came but "said that Lyft did

not offer service to the wheelchair bound." Ramos states that his attorney asked the driver if he had ever been trained to service disabled customers and he said, "No." Ramos states that, if Uber or Lyft were to accommodate him and his wheelchair, he would use their services.

The affidavits of Plaintiffs Posadas and Williams are similar. Posadas resides in Houston and uses METRO, METROLift transportation services, and traditional taxi cab services. Posadas states that she knew before filing suit that Uber and Lyft had made the decision to deny service to mobility-impaired Texans because it had been reported in the news, had been a topic of conversation among mobility-impaired customers who relied on private transportation, and the issue was discussed "in advance of public hearings for the City of Houston that was considering an ordinance that would allow Uber and Lyft and companies like them to operate legally." Posadas states, "It was common knowledge among mobility-impaired advocates that Uber and Lyft refused service to customers in wheelchairs." Posadas states that she did not attempt to use Uber or Lyft before filing suit because she knew they would have denied her service, such past denials of service by others had been humiliating, and she chose not to order Lyft or Uber before filing suit. She also examined the apps and neither provided a method to identify a mobility-impaired customer or to request an accommodating vehicle.

Posadas states that, after filing the lawsuit, she tested Uber and Lyft and both denied her service, "confirming what [she] already knew about their services." Posadas states that, if Uber or Lyft would accommodate her and her wheelchair, she would use their services. Plaintiff Tina Williams also resides in Houston and uses METRO, METROLift, and traditional taxi cab services. Her affidavit is substantially similar to Posadas's affidavit.

The Court finds that Plaintiffs have demonstrated that they had actual notice at the time they filed suit sufficient to invoke the futile gestures doctrine. They state that they had actual knowledge that Uber and Lyft deny service to customers in wheelchairs, such as themselves, and support these assertions by stating that Uber and Lyft's lack of ADA compliance was reported in news articles, was discussed among mobility-impaired advocates, and was discussed in connection with public hearings in the City of Houston. In addition, each Plaintiff states that they examined the apps and determined that they lacked a method for the rider to identify as mobility-impaired or to request an accommodating vehicle. Therefore, they were not required to engage in the futile gesture of attempting to obtain rides through Lyft and Uber before filing suit. The events after filing suit

provide evidence that they were correct that they would have been denied service based on their disabilities. Further, each Plaintiff states that, if Uber and Lyft would accommodate them, they would use their services. This is a credible statement, given their frequent use of public transportation options such as taxis, METRO, and VIA.

Plaintiffs therefore suffered a concrete and particularized injury at the time they filed suit sufficient for standing – notice of the noncompliance, deterrence, and the loss of opportunity of using Uber and Lyft that is enjoyed by non-disabled customers. The relief sought by Plaintiffs – an order requiring Uber and Lyft to accommodate the mobility impaired community, including themselves – would provide them a direct benefit.[5] Accordingly, Defendants' motions to dismiss Plaintiffs' complaint for lack of standing under Rule 12(b)(1) are denied.

**C. Whether Plaintiffs state a claim and Plaintiffs' Motion to Amend the Complaint**

Plaintiffs allege that they are individuals with disabilities, and that Defendants Uber and Lyft engage in a demand responsive system as defined by § 12181 and are subject to § 12184. Proposed Am. Compl. ¶¶ 5, 40. In the proposed Amended Complaint, Plaintiffs allege (1) that Uber and Lyft do not provide vehicles-for-hire services to mobility impaired consumers such as Plaintiffs who require wheelchair accessible transportation vehicles or other accommodating services; (2) Uber and Lyft allow their vehicles-for-hire to deny service to the disabled; (3) Uber and Lyft provide no training or guidance to the drivers about how to lawfully meet the needs of disabled consumers; (4) upon information and belief, Uber's and Lyft's fleets contain vehicles accessible to Plaintiffs, but none of these vehicles was dispatched to Plaintiffs when they used the apps to request rides; (5) Uber and Lyft and their service provides have failed to provide any mechanism by which to serve mobility impaired individuals such as Plaintiffs and others similarly situated; and (6) Uber and Lyft have refused to make reasonable accommodations in policies, practices, and procedures or to provide auxiliary aids and services necessary to allow full use and enjoyment of their transportation services by Plaintiffs. The proposed Amended Complaint further alleges that: a Lyft driver told Plaintiff Ramos that he lacked training to assist disabled riders (¶ 26); that an Uber driver could not

---

[5] As the Court noted in its previous order, whether Defendants are subject to the ADA or are violating the ADA and whether Plaintiffs are entitled to relief are issues intertwined with the merits, and thus it is improper to dismiss for lack of jurisdiction on these bases.

accommodate Plaintiff Williams and suggested that next time she needed a ride, she should call Uber limousine service (¶ 30); that a Lyft driver told Plaintiff Posadas that Lyft did not provide any training concerning transporting or accommodating people with mobility disabilities (¶ 34) and told Plaintiff Posadas "that no services for the disabled were available through Lyft (¶ 34);" and an Uber driver told Plaintiff Posadas that he had not received any training through Uber about how to handle, transport, or accommodate people with mobility impairments (¶ 38).   Plaintiffs allege that Defendants are violating § 12184(a) of the ADA, 49 C.F.R. § 37.29 of the ADA implementing regulations, and Chapter 121 of the Texas Human Resources Code.[6]

Plaintiffs therefore allege that Defendants are subject to Title III and that Plaintiffs have been denied services and are being discriminated against because of their disabilities in violation of Title III.   These allegations are sufficient to state a claim at the pleading stage.   *Reeves v. MV Transp., Inc.*, 845 F. Supp. 2d 104, 106 (D.D.C. 2012) ("A plaintiff alleges a violation of Title III of the ADA by asserting that he is an individual with a disability, that the defendant is subject to Title III, and that he was denied an opportunity to benefit from the defendant's services or otherwise was discriminated against because of his disability."). *Cf. Gonzales v. H.E. Butt Grocery Co.*, 226 F. App'x 342, 344 (5th Cir. 2007)(to state a claim under § 12182 of the ADA, a plaintiff must allege that he was "discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").   Nevertheless, the Court will address Defendants' specific arguments for completeness.

1. whether Defendants are subject to § 12184

Defendants argue that they are not subject to § 12184 because they do not provide specified public transportation services and are not engaged in the business of transporting people, but are simply mobile-based ridesharing platforms to connect drivers and riders.   Lyft argues that it does

---

[6] Plaintiffs also amend "in an abundance of caution" to assert that Defendants are public accommodations because they provide services and their operations affect commerce.   Plaintiffs argue that the apps are "more like restaurants that operate a website through which the public can place orders" and that Defendants exist both in cyberspace and in their fleet of vehicles open to the public.

not own the vehicles drivers use or provide any transportation.  Uber contends that it "merely provide[s] a platform for people with particular skills or assets to connect with other people looking to pay for those skills or assets."  Docket no. 6 at 3.  Defendants further argue that since Plaintiffs do not allege that they were unable to use the app, Defendants are not discriminating against them. Plaintiffs respond that Defendants do not merely connect people seeking a ride to those who are willing to give a ride, and that Defendants pay or employ drivers to transport their users, who in turn pay Defendants for the transportation service.

Plaintiffs' allegation that Defendants are subject to § 12184 as private entities that are primarily engaged in the business of transporting people is plausible.  As the Supreme Court has noted, the fact that the ADA "can be applied in situations not expressly anticipated by Congress" demonstrates its breadth.  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001).  Whether Defendants "provide specified public transportation services" or are "primarily engaged in the business of transporting people" is a mixed question of law and fact that cannot be resolved at this point without going outside the Complaint and converting the motion to a motion for summary judgment.

2. Failure to identify or allege they requested a reasonable accommodation

Uber argues that Plaintiffs fail to articulate an "adequate accommodation" and that Uber "has no ability to require App users to modify their personal vehicles or control the conditions under which they operate."  Uber also argues that Plaintiff's failure to request and identify a reasonable accommodation is fatal under Fifth Circuit precedent.  Plaintiffs' Amended Complaint alleges a violation of § 12184(b)(2), which specifies that discrimination includes the failure "to make reasonable modifications consistent with those required under section 12182(b)(2)(A)(ii) of this title."

In a Title III case under § 12182(b)(2)(A)(ii), the "plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable."  *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997).  However, Uber cites no cases that state that a plaintiff must allege a specific reasonable accommodation at the pleading stage, especially in a denial of service case.

Uber states that Plaintiffs' failure to articulate an accommodation "is understandable" because "Uber only controls its smartphone App, and has no ability to require App users to modify their personal vehicles or control the conditions under which they operate."  Docket no. 6 at 14-15.

The Court notes that this latter statement is contradicted by another statement in Uber's motion, that "anyone with a valid driver's license, car insurance, a clean record and a four-door vehicle can log onto the App and connect with ride-seekers." *Id.* at 3.[7] Thus, Uber does appear to have some control over the conditions under which drivers operate. In addition, the website that Uber refers the Court to and asks the Court to take judicial notice of refers to Uber drivers as independent contractors.[8] Thus, it appears disingenuous for Uber to protest that it does not and cannot exert any control over its drivers. Moreover, the extent to which Uber or Lyft exercise control over drivers is a matter outside the Complaint and is thus inappropriate for resolution in a 12(b)(6) motion.

Uber also asserts that "Plaintiffs fail to explain how Uber could alter its smartphone App to make such accommodations for the mobility impaired community, what those accommodations should be or how they would redress Plaintiffs' injury" and this "demonstrates the unworkability of Title III's application to technology companies that provide platforms for peer-to-peer sharing." Docket no. 6 at 4. However, Plaintiffs complain that the apps do not allow a rider to identify as mobility impaired, and Uber presumably controls whether riders can identify as mobility impaired in the app. And Uber presumably controls whether riders can request a specific type of vehicle that would accommodate their disability. Further, although Uber claims it cannot require its drivers to modify their vehicles, some drivers might do so voluntarily or may already have modified vehicles, and Defendants presumably could provide a way for disabled riders to connect with such drivers through the app. The Court therefore rejects Defendants' assertion that there are no plausible reasonable accommodations within Defendants' control.

3. Whether Uber complies with the regulations at 49 C.F.R. Part 37

Uber argues that, even if it is subject to Title III, dismissal is warranted because Title III requires it to refrain only from the following acts: (1) imposing eligibility requirements that screen out or tend to screen out individuals with disabilities; (2) denying a ride to an individual with a

---

[7] Uber also makes the perplexing statement that it "controls no aspect of drivers' means or methods of connecting with riders." Docket no. 6 at 3. However, Uber controls the app that *is* the means/method of connecting drivers with riders.

[8] Further, 49 C.F.R. § 37.3 provides that "[o]perates includes, with respect to a fixed route or demand responsive system, the provision of transportation service by a public or private entity itself or by a person under a contractual or other arrangement with the entity."

disability who is capable of using the taxi vehicles; (3) insisting that a wheelchair user wait for a lift-equipped van if the person could use an automobile; (4) refusing to assist with stowing a wheelchair in the trunk; and (5) charging a higher fee for carrying a person with a disability or for stowing a wheelchair, and Plaintiffs do not allege that Uber does any of those things.  Uber motion at 15-16 (citing 49 C.F.R. § 37.29(a)(c), 49 C.F.R. § 37 app. D).  However, Plaintiffs do allege that they are capable of using taxi vehicles and that Uber denied them rides.[9]

Moreover, the actions listed in 49 C.F.R. § 37.29, which govern private entities providing taxi service, are not exclusive – the regulations expressly say that private entities providing taxi services "shall not discriminate against individuals with disabilities by actions including, <u>but not limited to</u>, refusing to provide service to individuals with disabilities who can use taxi vehicles, refusing to assist with the stowing of mobility devices, and charging higher fares or fees for carrying individuals with disabilities and their equipment than are charged to other persons.  49 C.F.R. § 37.29(c) (emphasis added).[10]  Although section 37.29 includes provisions specifically for taxi services, there is no indication that taxi services are not *also* subject to other provisions applicable

---

[9] The Court does agree with Defendants that it is unclear whether Plaintiffs can use "automobiles" and that the regulations state that "[p]roviders of taxi services are not required to purchase or lease accessible automobiles" and are not required "to purchase vehicles other than automobiles in order to have a number of accessible vehicles" in their fleets. 49 C.F.R. § 37.29(b). It is also unclear whether Plaintiffs can transfer to vehicles alone or whether they require assistance, and whether Plaintiffs are alleging that the ADA requires taxi services to provide transfer assistance. Further, there is ambiguity regarding Plaintiffs' complaints about Defendants' vehicles.  The Amended Complaint states, on information and belief, that Defendants have vehicles accessible to Plaintiffs in their fleets, but these were not dispatched to Plaintiffs.  However, Plaintiffs' response states that Lyft and Uber are required to provide service to disabled individuals and "may choose any method that complies with this requirement, including hiring owners of accessible vehicles or responding to disabled individuals' requests with accessible vehicles." Docket no. 14 at 9.  Plaintiffs appear to assert that Defendants must obtain accessible vehicles for their fleet.  Plaintiffs should be prepared to discuss the specific contours of their claims at the status conference (set at the end of this Order).

[10] Other provisions in the regulations impose additional requirements, such as "the entity shall permit service animals to accompany individuals with disabilities in vehicles and facilities" and "the entity shall make available to individuals with disabilities adequate information concerning transportation services, [which] includes making adequate communications capacity available, though accessible formats and technology, to enable users to obtain information and schedule service."  49 C.F.R. § 37.167(c), (f).

generally to "private entities primarily engaged in the business of transporting people" or providing specified public transportation services.  In fact, it appears that the opposite is true, as 49 C.F.R. § 37.29(a) expressly states that "[p]roviders of taxi service are subject to the requirements of *this part* [Part 37] for private entities primarily engaged in the business of transporting people which provide demand responsive service."  Similarly, Subpart B expressly states that it applies to "any private entity that provides specified public transportation."  49 C.F.R. § 37.21. Thus, rather than limiting taxi services to the regulations in § 37.29, the regulations expressly state that taxi services are subject to the requirements in Part 37, and set forth additional provisions specific to taxi services.

Uber also argues that Plaintiffs fail to state a claim under 49 C.F.R. § 37.173, which requires that "[e]ach public or private entity which operates a fixed route or demand responsive system shall ensure that personnel are trained to proficiency, as appropriate to their duties, so that they operate vehicles and equipment safely and properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities." 49 C.F.R. § 37.173.  Uber argues that this provision does not require it to train its app-users because it only applies to "personnel."  Uber asserts that, because it does not employ its app-users, its failure to train them would not be a discriminatory act under Title III. However, whether the drivers are "personnel" would require the Court to look outside the Complaint and thus this issue cannot be resolved in a 12(b)(6) motion to dismiss.

### Conclusion

Defendants' motions to dismiss (docket nos. 6 & 10) are DENIED.  Plaintiff's motion for leave to file an amended complaint (docket no. 13) is GRANTED.  The Clerk shall file the Amended Complaint.

Further, this case is set for a status conference and hearing on all pending motions, if any, on **TUESDAY, MARCH 17, 2015** at 1:30 p.m. in Courtroom Number 3, John H. Wood, Jr. United States Courthouse, 655 E. Cesar Chavez Blvd., San Antonio, Texas 78206.

The parties should be prepared to discuss all pending motions, if any.  In addition, no later than three business days prior to the hearing, each party should file an advisory (or the parties may file one agreed-upon advisory) with the Court addressing the following:

1.      Are there any outstanding jurisdictional issues?

2.      What are the causes of action, defenses, and counterclaims in this case?  What are

-18-

the elements of the cause(s) of action, defenses, and counterclaims pled?

3.      Are there any agreements or stipulations that can be made about any facts in this case or any element in the cause(s) of action?

4.      What, if any, discovery has been completed?  What discovery remains to be done?

5.      What, if any, discovery disputes exist?

6.      Have the parties discussed the desirability of filing a proposed order pursuant to Federal Rule of Evidence 502?

7.      Have the parties discussed mediation?


It is so ORDERED.

SIGNED this 20th day of February, 2015.


_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE